NOT FOR PUBLICATION

# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| GLADYS V. ARONI HUAMAN,<br><br>                   Plaintiff,<br><br>    v.<br><br>ACTING COMMISSIONER OF SOCIAL SECURITY,<br><br>                   Defendant. | Civil Action No. 14-4607 (SDW)(SCM)<br><br>**OPINION**<br><br>September 23, 2015 |

**WIGENTON,** District Judge

      Before this Court is Plaintiff Gladys V. Aroni Huaman's ("Plaintiff" or "Huaman") appeal of the final administrative decision of the Acting Commissioner of Social Security ("Commissioner"), with respect to Administrative Law Judge Marissa Ann Pizzuto's ("ALJ Pizzuto") denial of Huaman's claim for Social Security Disability Insurance Benefits ("SSDI") pursuant to 42 U.S.C. § 405(g).

      This appeal is decided without oral argument pursuant to Federal Rule of Civil Procedure 78. This Court has subject matter jurisdiction pursuant to 42 U.S.C. § 405(g). Venue is proper under 28 U.S.C. § 1391(b). For the reasons stated herein, this Court **AFFIRMS** ALJ Pizzuto's decision.

## I. PROCEDURAL AND FACTUAL HISTORY

### A. Procedural History

Huaman applied for Social Security Disability Benefits on March 1, 2010, which was denied at the initial and reconsideration stages. (R. 367-375, 276-281, 282-284.) Upon Huaman's request for a hearing before an administrative law judge (R. 285-286), ALJ Pizzuto conducted a hearing on April 26, 2012 , at which Plaintiff appeared with counsel and testified. (R. 302-325, 326-329, 250-273.) On November 30, 2012, ALJ Pizzuto issued a decision finding that Plaintiff was not disabled and denying her application for disability benefits. (R. 228-249.) Huaman filed a timely appeal. On June 4, 2014, the Appeals Council declined to review ALJ Pizzuto's November 30, 2012 decision, making it the Commissioner's final decision. (R. 1-6, 205-206.) The main issue before this Court is whether ALJ Pizzuto's November 30, 2012 decision is supported by substantial evidence.

### B. Personal and Employment History

Huaman was 37 years of age on the alleged onset date. (See R. 252.) She completed the 12th grade in Peru. (R. 266.) Huaman last worked as a packer and machine operator. (R. 255.)

### C. Medical History

On March 20, 2006, Huaman was seen by Dr. Richard Monti for complaints of persistent right heel pain despite therapy. (R. 806.) She was diagnosed with high grade plantar fasciitis-right, moderate grade plantar fasciitis left foot, partial tear of right plantar fascial band, tarsal tunnel syndrome bilateral, nerve entrapment to medial plantar calcaneal nerve secondary to trauma, calcaneal bursitis, neuritis and heel pad swelling. (R. 808.)

On March 21, 2006, Huaman underwent a radiofrequency lesion/coblation of the right heel and thermoneurolysis of the right foot for painful refractory plantar fasciitis of the right foot,

neuritis of the right foot, tarsal tunnel syndrome and partial tear of the plantar fascia. (R. 801.) On April 26, 2006, she was noted to have had only marginal improvement despite physical therapy and radiofrequency. (R. 855.)

On May 26, 2006, Plaintiff was seen at Hackensack University Medical Center for complaints of right foot pain radiating to her thigh. (R. 461.) X-rays of her right foot demonstrated a spur at the insertion of the plantar aponeurosis. (R. 468.) She was prescribed Percocet, Motrin, and Keflex and discharged. (R. 466.)

On June 27, 2006, Huaman underwent a neurological evaluation with Dr. Eyad Nayal for complaints of pain and burning sensation over the right medial malleolus area extending to the plantar aspect of the right foot and low back pain radiating to the right leg. (R. 1198.) There was positive Tinel's sign over the right medial mealleolus area and decreased pinprick sensation over the right medial plantar nerve distribution. (R. 1199.) She had clinical evidence of right L5-S1 lumbosacral radiculopathy. (Id.)

Huaman was treated by Dr. Paul Klein in June 2006 for plantar fasciitis. (R. 477.) She received an examination and injection. (Id.)

On July 17, 2006, Huaman presented with severe muscle spasm in the bilateral lower lumbar and bilateral trapezius regions. (R. 1143.) She continued chiropractic care with Dr. Kyle Eopechino through January 22, 2007 with improvements in her symptoms. (R.1144-1175.)

A July 27, 2006 NCV/EMG of the lower extremities revealed right L5-S1 lumbo-sacral radiculopathy. (R. 483.) A July 28, 2006 MRI of the lumbar spine revealed an L5-S1 bulging annulus, small central and left paracentral herniated indentation of the thecal sac and left sacral nerve root and encroachment of the left neural foramen. (R. 484.)

3

She was evaluated by Dr. Nayal on September 7, 2006 for right ankle pain and burning sensation over the right medial malleolus area. (R. 769.) She was diagnosed with right L5-S1 lumbosacral radiculopathy and advised to lose weight. (Id.)

Huaman underwent foot surgery on March 21, 2006 for plantar fasciitis and injection therapy. (R. 485.) She was also seen in the ER for severe pain along her entire right side which traveled up her leg. (Id.) Upon examination with Dr. Klein, Huaman had positive Tinel sign for right medial calcaneal nerve and posterior tibial nerve and pain was elicited over the medial calcaneal tubercle. (Id.) A week later, Huaman presented using crutches and complaining of extreme pain. (Id.) Dr. Klein examined Huaman again on August 7, 2006, reviewing an MRI report that showed bulging annulus at L5-S1 with herniation and encroachment on neural foramen and a neurology report that diagnosed Plaintiff with right L5-S1 lumbosacral radiculopathy. (Id.) Dr. Klein questioned Plaintiff's previous diagnosis and treatment of plantar fasciitis and was of the opinion that Huaman was suffering from neuritic pain due to her bulging disc, affecting her foot and leg. (Id.)

A February 27, 2007 MRI of the lumbosacral spine revealed a central annular tear presenting as a high intensity zone on T2 weighted sequences and a 3-4 mm broad-based left paracentral disc bulge slightly contacting the left S1 nerve root in the lateral recess. (R. 771.)

On May 13, 2008, Huaman reported a history of injuring her back while doing heavy lifting at work and had been placed on disability. (R. 597.) She was diagnosed with backache and being overweight. (R. 599.)

On June 6, 2008, Huaman complained of feelings of depression which began earlier in the year when she was having marital problems with her abusive husband. (R. 594.) She reportedly

ate less, slept less, had less energy and decreased concentration. (R. 564.) She was diagnosed with depression, anemia, and obesity. (R. 595.)

Huaman was under the care of Dr. Eopechino from July 31, 2007 through January 21, 2008. (R. 487.) A February 27, 2007 MRI of the lumbar spine revealed an L5-S1 central annular tear and 3-4 mm broad-based left paracentral disc bulge slightly contacting the left S1 nerve root in the lateral recess. (Id.) She was diagnosed with lumbar radiculitis, lumbar sprain/strain and lumbago and treated with chiropractic adjustments and decompression and deep tissue therapy. (Id.) Her pain was noted to be reduced on January 21, 2008. (Id.)

On September 2, 2008, Huaman was seen for severe pain in the entire right side of her body, rated 9/10. (R 588.) On December 12, 2008, she continued to complain of right knee and leg pain rated 9/10. (R. 670.)

Dr. Bassam Odatalla completed a report for the State of New Jersey indicating that Huaman was incapable of working from approximately September 2008 due to chronic back pain, sciatica and plantar fasciitis. (R. 937.) He diagnosed Plaintiff with depression. (Id.) He noted that Plaintiff could not stand, walk, climb, stoop, bend or lift for extended periods of time. (Id.)

On April 24, 2009, Huaman was examined by Dr. Samuel Wilchfort at the request of the Division of Disability Services ("DDS"). (R. 490.) She reported a history of low back pain and sciatica with pain radiating down the right leg and occasional numbness. She could walk 3-5 blocks, lift 5 pounds, stand for 20-30 minutes and sit for 20-30 minutes. (R.490.) She also complained of pain in the right ankle. (Id.) She was diagnosed with a right heel spur but Dr. Wilchfort reported that x-rays would be helpful for confirmation. (R. 491.) She also was diagnosed with mild depression and low back pain with sciatica. (Id.) Plaintiff was neurologically intact with normal reflexes and range of motion. (Id.)

5

On April 28, 2009, Huaman was examined by Dr. Solomon Miskin at the request of the DDS. (R. 493.) She was observed to walk with a gait and utilized a cane. (Id.) She appeared somewhat anxious and restless during the evaluation. (Id.) Huaman was diagnosed with post-traumatic stress disorder, as well as chronic and major depressive disorder. (R. 495.)

On June 28, 2010, Huaman was seen in the emergency room for complaints of abdominal pain, nausea, vomiting, diarrhea and left shoulder pain. (R. 720.) She was treated with Aspirin, Percocet, Maalox, viscous lidocaine, donnatal, Motrin and Parafon Forte DSC. (R. 721.) Her pain decreased and she was discharged. (R. 721, 725.)

On July 7, 2010, Dr. Anthony Candela evaluated Huaman at the request of DDS. (R. 608.) Dr. Candela diagnosed Plaintiff with chronic depression secondary to industrial accident, moderately severe and borderline intellectual functioning. (R. 610.)

On July 17, 2010, Huaman underwent a physical examination with Dr. Mariam Rubbani at the request of DDS. (R. 611.) She was diagnosed with cervical myofascial pain, cervical facet syndrome and lumbar myofascial pain. (R. 612.)

On July 22, 2010, Huaman returned to the emergency room with complaints of pain at the back of her head, rated 9/10 with dizziness, nausea and vomiting. (R. 733.) She was treated with IV fluids and discharged home. (R. 734.) On September 21, 2010, she was seen in the emergency room for complaints of back pain. (R. 744.) She had tenderness on palpation to the right scapular and subscapular area and decreased range of motion. (R. 748.) Differential diagnosis included fatigue, musculoskeletal back pain, sciatica and sprain. (Id.) Her diagnosis upon discharge included acute back pain, muscle spasm, tendonitis and plantar fasciitis. (R. 749.) She was treated with pain medication. (R. 748-749.)

Huaman was hospitalized from October 3, 2010 through October 8, 2010 for septic shock, recurrent syncopal episodes and uterine fibroids. (R. 692.) On October 20, 2010, she was seen in the emergency room with complaints of low back pain radiating down her right leg. (R. 751.) She was diagnosed with back pain with sciatica and discharged. (R. 755.)

On April 13, 2011, Huaman was seen in the emergency room at St. Joseph's hospital for high blood sugar, an ankle sprain and double vision. (R. 1045.) She was diagnosed with major depressive disorder, recurrent and had a GAF of 50. (R. 1047.)

On June 1, 2011, Huaman complained of back pain and pain in both legs. (R. 1087.) She was diagnosed with generalized osteoarthritis involving multiple sites. (R. 1088.)

On June 2, 2011, Huaman presented to the emergency room with complaints of chest pain radiating to her right arm, abdominal pain, nausea and shortness of breath. (R. 1035.) On June 19, 2011, Huaman was seen in the emergency room for uterine fibroids. (R. 766.) On June 20, 2011, she was seen in the emergency room for acute low back pain and muscle spasms. (R. 767.) On June 27, 2011, she was seen in the emergency room for abdominal pain and uterine fibroids. (R. 765.)

On August 12, 2011, Huaman's depression screening revealed severe depression. (R. 1080.) She had a flat affect, was tearful, and had a depressed mood. (Id.)

On September 22, 2011, Huaman went to the emergency room for complaints of chest pain, shortness of breath and lower abdominal pain. (R. 1007-1008.) She was diagnosed with gastritis. (R. 1010.)

On January 18, 2012, Huaman was seen in the emergency room for complaints of pain with urination, right arm pain, back pain and weakness. (R. 1002.) On February 27, 2012, Huaman went

to the emergency room for neck and back pain. (R. 997.) She was diagnosed with acute neck pain-cervicalgia and prescribed Flexeril 10 mg and Percocet 5/325 mg. (R. 999.)

She followed up with her doctor on March 2, 2012 and complained of back pain that had gotten progressively worse. (R. 1074.) She began to cry during her examination and reported feeling very depressed and sad. (Id.)

On March 6, 2012, Huaman was seen at Chilton Memorial Hospital for complaints of low back pain. (R. 782.) On March 13, 2012, she presented to the emergency room at St. Joseph's Hospital for a bladder infection, chronic back pain and depression. (R. 995.) On April 10, 2012, she was seen again in the emergency room at St. Joseph's Hospital for back pain, nausea, dizziness and abdominal pain. (R. 993.) She had mild abdominal tenderness in the right lower quadrant, right trapezius and right scapular area. (R. 994.)

On March 13, 2012, she was seen in the emergency room for back pain, nausea and dizziness. (R. 181.) She was diagnosed with a bladder infection, chronic back pain and depression. (R. 181.) On July 5, 2012, Huaman presented to the emergency room for complaints of neck problems, nausea and dizziness. (R. 164.) She was diagnosed with acute mid back pain. (Id.) On September 12, 2012, she was seen in the emergency room with complaints of lower abdominal pain and leg pain. (R. 147.) She was diagnosed with abdominal pain and uterine fibroids. (R. 152.) On October 17, 2012, Huaman complained of lower abdominal pain and was diagnosed with gastritis. (R. 104.)

On October 19, 2012, Huaman complained of right sided body pain. (R. 223.) She was diagnosed with generalized osteoarthritis involving multiple sites. (Id.)

On December 14, 2012, Huaman was seen in the emergency room for complaints of dizziness, abdominal pain and pain with urination. (R. 53.)

On January 19, 2013, she presented to the emergency room for complaints of abdominal pain, diarrhea and nausea. (R. 37.) She received IV hydration and discharged home. (R. 39.)

An April 17, 2013 MRI of the lumbar spine revealed a central to left subarticular protrusion at L5-S1 displacing the traversing left S1 nerve root resulting in severe left subarticular stenosis. (R. 8.) An MRI of the cervical spine revealed a central protrusion at C5-6 without impingement but with mild canal stenosis and broader but thinner central protrusion at C6-7. (R. 10.)

**D. Plaintiff's Testimony**

Huaman alleged disability beginning on March 14, 2006 due to difficulties with her foot, ankle and shoulder and depression. (R. 254, 266.) Huaman testified that she last worked in 2006 as a packer and machine operator. (R. 255.) She testified that she was experiencing pain in her lower back that radiated down her legs that stemmed from an accident involving her ankle and foot. (R. 255.) Huaman testified that she took medication for her pain that made her sleepy and affected her liver. (R. 256, 263.)

Huaman testified that she has difficulty sleeping at night and must nap during the day. (R. 256.) She stated that she was told to use a cane but it made her feel old and depressed. (R. 256.) She testified that she needed to use the cane whenever she had difficulty getting out of bed, which was multiple times a week. (R. 256.) Huaman testified that she had a problem with her right ankle that limited her ability to stand and walk. (R. 264.) She also claimed to have problems bending to tie her shoes, putting her pants on and getting up from a seated position. (R. 264.)

Huaman testified that she had pain in her right ear and could not hear in that ear. (R. 265.) She stated that she had this impairment since age 20. (R. 265.)

Huaman testified that she had pain in her shoulder, arm, and hands that occurred every 20 or 30 minutes, and suffered constant back pain. (R. 267.) She also experienced sharp pains in her legs that extended down her entire leg on the right side and ankle and heel pain. (R. 267-268.)

Huaman had to get in and out of the bathtub slowly and at times needed help from her friend. (R. 257.) She was scared to live alone because she was afraid that she would fall and no one would be able to help or call for help. (R. 257-258.)

Huaman stated that she received treatment for depression at St. Joseph's and was prescribed Prozac. (R. 260.) Part of her depression stemmed from issues that she had with her husband. (R. 269-270.) She received counseling and treatment for those reasons. (R.270.) She had problems with memory and concentration. (R. 263.) Specifically, she had moments where she would not know where she was or remember to take her medications. (R. 263.) She had issues with her husband when she first came to the United States.

She testified that she was studying English two to three times a week at Oasis, A Haven for Women and Children in Paterson, New Jersey. (R. 269.) Her friend would bring her by car. (R. 269.) She testified that she hoped to learn English so that she could have a career and return to work. (R. 270.)

## II.     LEGAL STANDARD

### A.  Standard of Review

In social security appeals, this Court has plenary review of the legal issues decided by the Commissioner. Knepp v. Apfel, 204 F.3d 78, 83 (3d Cir. 2000).  On the other hand, this Court's review of the ALJ's factual findings is limited to determining whether there is substantial evidence to support those conclusions. Hartranft v. Apfel, 181 F.3d 358, 369 (3d Cir. 1999).  Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion." Pierce v. Underwood, 487 U.S. 552, 565 (1988) (internal quotations omitted).  Substantial evidence is "less than a preponderance of the evidence, but 'more than a mere scintilla;' it is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Bailey v. Comm'r of Soc. Sec., 354 Fed. Appx. 613, 616 (3d Cir. 2009) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)).  If the factual record is adequately developed, substantial evidence "may be 'something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence.'" Daniels v. Astrue, 2009 U.S. Dist. LEXIS 32110, at *2 (M.D.Pa. Apr. 15, 2009) (quoting Consolo v. Fed. Mar. Comm'n, 383 U.S. 607, 620 (1966)).  "The ALJ's decision may not be set aside merely because we would have reached a different decision." Cruz v. Comm'r of Soc. Sec., 244 Fed. Appx. 475, 479 (3d Cir. 2007) (citing Hartranft, 181 F.3d at 360).  However, "where there is conflicting evidence, the ALJ must explain which evidence he[/she] accepts and rejects, and the reasons for that determination." Cruz, 244 Fed. Appx. at 479 (citing Hargenrader v. Califano, 575 F.2d 434, 437 (3d Cir. 1978)).

      **B.**    **Standard for Determining Eligibility for Disability Benefits**

An individual will be considered disabled under the Act if he/she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment" lasting continuously for at least twelve months.  42 U.S.C. § 423(d)(1)(A).  The physical or mental impairment must be severe enough to render the individual "not only unable to do his[/her] previous work but [unable] considering his[/her] age, education, and work experience, [to] engage in any other kind of substantial gainful work which exists in the national economy . . . ."  § 423(d)(2)(A). Subjective complaints of pain, alone, cannot establish disability.

11

§ 423(d)(5)(A). Instead, a claimant must show that the "medical signs and findings" related to her ailment have been "established by medically accepted clinical and laboratory diagnostic techniques, which show the existence of a medical impairment that results from anatomical, physiological, or psychological abnormalities which could reasonably be expected to produce the pain or other symptoms alleged . . . ." § 423(d)(5)(A).

The Social Security Administration (the "SSA") utilizes a five-step sequential evaluation process to determine whether an applicant is entitled to Social Security benefits. Cruz, 244 Fed. Appx. at 480 (citing 20 C.F.R. §§ 404.1520 (a)(4)(i)-(v)). "A negative conclusion at steps one, two, four or five precludes a finding of disability." Cruz, 244 Fed. Appx. at 480. However, "[a]n affirmative answer at steps one, two or four leads to the next step. An affirmative answer at steps three or five results in a finding of disability." Id. (quoting 20 C.F.R. §§ 404.1520 (a)(4)(i)- (v)) (internal quotations omitted).

The United States Supreme Court describes the evaluation process as follows:

> The first two steps involve threshold determinations that the claimant is not presently working and has an impairment which is of the required duration and which significantly limits his ability to work. In the third step, the medical evidence of the claimant's impairment is compared to a list of impairments presumed severe enough to preclude any gainful work. If the claimant's impairment matches or is "equal" to one of the listed impairments, he qualifies for benefits without further inquiry. If the claimant cannot qualify under the listings, the analysis proceeds to the fourth and fifth steps. At these steps, the inquiry is whether the claimant can do his own past work or any other work that exists in the national economy, in view of his age, education, and work experience. If the claimant cannot do his past work or other work, he qualifies for benefits.

Sullivan v. Zebley, 493 U.S. 521, 525-26 (1990); see also 20 C.F.R. §§ 404.1520(a)(4)(i)-(v). The burden of persuasion lies with the claimant in the first four steps. Malloy v. Comm'r of Soc. Sec., 306 Fed. Appx. 761, 763 (3d Cir. 2009). However, if the claimant is able to show that

the impairment prevents him/her from performing his/her past work the burden shifts to the Commissioner to demonstrate "that the claimant still retains a residual functional capacity to perform some alternative, substantial, gainful activity present in the national economy." Id. (citing Kangas v. Bowen, 823 F.2d 775,777 (3d Cir. 1987)).

Plaintiff contends that the ALJ's determination that Plaintiff is not disabled is reversible error because it ignores the weight of the substantial credible evidence on the record. Plaintiff also claims that the ALJ did not conduct a full residual functional capacity assessment. Furthermore, Plaintiff alleges that the record does not contain substantial evidence that would support a conclusion that Huaman is capable of sedentary work and that the ALJ failed to fully develop the record with regard to Huaman's ability to adjust to other work. (Pl. Br. 26-33.)

Upon consideration of the evidence, this Court affirms the ALJ's decision that Plaintiff is not disabled within the meaning of the Act because although Plaintiff has severe, medically-determinable impairments, a back disorder, plantar fasciitis (feet spurs) and secondary depressive disorder, she remains capable of sedentary exertion, except that she is limited to understanding, remembering and carrying out simple 1 and 2 instructions (Tr. 238).

Further, ALJ Pizzuto's finding that Plaintiff can perform the unskilled sedentary occupations administratively-noticed under the Commissioner's Medical-Vocational guidelines, 20 C.F.R. Part 404, Subpart P. Appendix 2 is supported by substantial evidence on the record (Tr. 241-242). Overall, this Court concludes that ALJ Pizzuto's decision is supported by substantial evidence.

### III. DISCUSSION

At steps one and two of the disability analysis, ALJ Pizzuto properly found that Plaintiff last met the insured status requirement of the Social Security Act on December 31, 2011 and that

Plaintiff had not engaged in SGA since March 14, 2006, the alleged onset date of Plaintiff's disability. (R. 236).

At step three, ALJ Pizzuto properly found that Plaintiff suffered from the following severe impairments: "back disorder, plantar fasciitis (feet spurs) and secondary depressive disorder (20 CFR 404-1520(c))." Id.  ALJ Pizzuto's findings of severe impairment are supported by substantial evidence in the record.

Before analyzing step four, ALJ Pizzuto determined Plaintiff's RFC. In so doing, ALJ Pizzuto gave great weight to state agency psychological consultants who assessed that Plaintiff was capable of understanding, remembering, concentrating, and adapting adequately to do simple work tasks. (R. 240.)  She especially relied on the assessment of Dr. Joseph Udomsaph who evaluated Plaintiff after Plaintiff returned from a two-month vacation in Peru where she had reportedly done a lot of walking. (R. 549). Dr. Udomsaph found, based on his assessment of Plaintiff's functional capacity, that she was capable of the light range of sedentary work, including lifting up to 20 pounds occasionally, standing and walking for four hours in an eight hour day and sitting for six hours in an eight hour day. (R. 601-607.)

In determining Plaintiff's RFC, ALJ Pizzuto considered Plaintiff's back problems and therefore limited her lifting and carrying capability to 10 pounds, even though Dr. Udomsaph deemed her capable of carrying and lifting 20 pounds. The ALJ also relied greatly on the conclusions of Dr. Golin, the state agency psychiatrist, that Plaintiff was capable of understanding remembering, concentrating, persisting and adapting adequately to simple work tasks. (R. 240, 615-631). This Court discerns no error in the ALJ's reliance upon the conclusion of state agency physicians and psychiatrists as they are "highly qualified . . . physicians . . . who are experts in Social Security disability evaluation." 20 C.F.R. § 404.1527(e)(2)(i).  Furthermore, Plaintiff

admitted that she was able to pay her bills, attend church services with friends, and take public transportation on her own, all of which suggests that she is both physically and mentally capable of simple, sedentary tasks.

At step four, ALJ Pizzuto properly determined that Plaintiff's impairments did not equal or exceed the impairments included in the Listing of Impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. Id. ALJ Pizzuto properly found that with regard to Plaintiff's "low back impairment, there is no evidence of frank neurological deficits in the lower extremities, [. . .] motor loss, atrophy, sensory or reflect loss." (R. 237). ALJ Pizzuto also found that Plaintiff's mental impairment did not equal or exceed the severity set forth in listing 12.04. Id. Listing 12.04 requires that a Plaintiff's mental impairment result in at least two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration. Id.

As ALJ Pizzuto properly found and cited adequate evidence on the record to support her conclusion that Plaintiff did not satisfy the paragraph B requirements. Id. Citing exhibits 3E and 11E, ALJ Pizzuto found that Plaintiff had only mild restrictions in her daily living activities. Id. Second, ALJ Pizzuto, citing exhibit 3, found that Plaintiff had only mild difficulties in social functioning, noting that she gets along with others, has friends, and attends church regularly. Id. Third, ALJ Pizzuto, citing exhibits 6F and 15F, found that Plaintiff had only moderate difficulties with regard to concentration, persistence, or pace. Id. Lastly, the record contains no evidence that Plaintiff experienced episodes of decompensation. (R. 237). Therefore, ALJ Pizzuto's determination that Plaintiff's impairments did not equal or exceed the impairments in the Listing

of Impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 is supported by competent evidence in the record.

At step five, ALJ Pizzuto properly found that Plaintiff had the residual functional capacity to perform sedentary work. ALJ Pizzuto found that although Plaintiff was limited to understanding, carrying out and remembering simple, 1-2 step instructions, she is capable of responding appropriately to supervision, coworkers, and usual work situations, and dealing with changes in a routine work setting. (R. 238.)

ALJ Pizzuto rightly noted that Plaintiff's only modality of pain management is prescribed medication and that she was not under the care of an orthopedic or pain management specialist. (R. 239.) ALJ Pizzuto noted that Plaintiff testified that she was prescribed a cane but did not like to use it and that there was no indication that she needs a cane. (R. 239.) ALJ Pizzuto opined that while Plaintiff complained of shoulder pain, there was no evidence of any shoulder abnormality. (R. 239.) ALJ Pizzuto also noted correctly that although Plaintiff complained of symptoms of depression, a consultative examination yielded that she had no signs of psychosis, her affect was appropriate, her mood was anxious and her memory and concentration were intact. (R. 239-240.)

ALJ Pizzuto found no social abnormalities, specifically noting that:

> The claimant has reported that she gets along with others including authority figures. She is independent in her daily activities aside from some physical help she may need. She reported that she prepares her own food, she does light housekeeping, she grocery shops with friends, she pays bills and she uses public transportation independently.

(R. 240). In making her determination, ALJ Pizzuto considered both objective medical evidence and other evidence, based on the requirements of 20 C.F.R. 404.1529 and 416.929 and Social Security Rulings ("SSRs") 96-4p and 96-7p. (R. 240). In support of her finding, ALJ Pizzuto gave substantial weight to opinion evidence from Dr. Odatalla, a primary care physician who indicated

that Plaintiff's chronic back pain, sciatica and plantar fasciitis limited her ability to stand, walk, climb, stoop, bend and lift for extended periods of time. (R. 240.)  ALJ Pizzuto properly found that Dr. Odatalla's assessment is consistent with a sedentary residual functional capacity. ALJ Pizzuto also gave substantial weight to state agency medical consultants' assessment limiting Plaintiff to a reduced light residual functional capacity. (R. 240.) ALJ Pizzuto properly found that in light of Plaintiff's chronic back pain, it is reasonable to limit her "lifting and carrying up to 10 pounds only." Id.  ALJ Pizzuto considered Plaintiff's age, education, work experience, and RFC, and applied these factors to the Medical-Vocational Rules.  Id.  She thereby found Plaintiff can perform work that exists in significant numbers in the national economy. (R. 241-242).

Lastly, ALJ Pizzuto did not err by analyzing step five without the benefit of a vocational expert because she appropriately relied upon SSR 96-9p and 85-15. See Padilla v. Commissioner of Soc. Sec., 2015 WL 1006262 *13 (D.N.J. 2015) (finding that the ALJ appropriately relied upon SSR 85-15, in finding, without the aid of a vocational expert, that Plaintiff's intellectual deficiency did not prevent him from meeting the basic mental demands of unskilled labor, including an ability to understand, carry out or remember simple instructions, and to function within a work-like setting).

## IV.   CONCLUSION

Because this Court finds that ALJ Pizutto's decision is supported by substantial evidence in the record, the Commissioner's determination is **AFFIRMED**.

s/Susan D. Wigenton, U.S.D.J.

cc:   Steven C. Mannion, U.S.M.J.